KENNEDY, JENNIK & MURRAY, P.C.
Attorneys for Petitioners
113 University Place, 7th Floor
New York, New York 10003
Tel. (212) 358-1500

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

-----------------------------------------------------------------x

In the Matter of the Application of

Families United for Racial and Economic Equality; Local 46,
Metallic Lathers and Reinforcing Ironworkers; Ironworkers
Local 361; Ironworkers Local 580; Enterprise Association
Steamfitters Local 638; Cement League, Inc.; New York City
Councilperson Letitia James and New York State Assembly
Member Walter T. Mosley,

**ARTICLE 78
VERIFIED
PETITION**

Index No. -------/13

Petitioners,

- against -

13100685

Michael Bloomberg, as Mayor of the City of New York;
Robert K. Steel, as Deputy Mayor for Economic
Development and Rebuilding; New York City Department of
Housing Preservation and Development; New York City
Economic Development Corporation; New York City
Housing Development Corporation; Acadia Realty Trust;
Albee Development LLC; Washington Square Partners, Inc.;
and BFC Partners Development LLC,

Respondents.

For a Judgment pursuant to Article 78 of CPLR and
Declaratory Judgment pursuant to CPLR 7001.

-----------------------------------------------------------------x

**FILED**

MAY 0 1 2013

COUNTY CLERKS OFFICE
NEW YORK

Petitioners, by their undersigned attorneys, allege as follows:

## INTRODUCTION

1.      This is a hybrid proceeding brought pursuant to Article 78 and Section 3001 of

the Civil Practice Laws and Rules ("CPLR") to annul a determination of Michael Bloomberg, as

Mayor of the City of New York; Robert K. Steel, as Deputy Mayor for Economic Development

and Rebuilding; New York City Department of Housing Preservation and Development; New York City Housing Development Corporation and the New York City Economic Development Corporation (collectively, "the City Respondents") to refuse to undertake the hard look required by the New York State Environmental Quality Review Act ("SEQRA") (ECL 8–0101, *et seq.*; 6 NYCRR 617.1, *et seq.*) and the City Environmental Quality Review ("CEQR") Rules (43 RCNY 6–01, *et seq.*; 62 RCNY 5–01, *et seq.*) before granting massive financial assistance to Acadia Realty Trust ("Acadia"), Washington Square Partners, Inc ("WSP"), Albee Development LLC ("Albee LLC"), and BFC Partners Development LLC ("BFC Partners") (collectively, "the Developer Respondents"). The Developer Respondents are constructing a large Downtown Brooklyn real estate project, known as City Point, which will harm local communities and the working class men and women who live in them by depressing their wages, by displacing residents and small businesses, and by increasing the percentage of luxury housing in a neighborhood which sorely needs more affordable housing. City Point is located at the corner of DeKalb and Flatbush Avenues and will encompass 1.9 million square feet, consisting of 650,000 square feet of retail space and 650 apartments ("the Project").

    2. An injunction under Article 78 halting further construction on the Project by the Developer Respondents pending compliance with SEQRA/CEQR and a determination that the City Respondents have acted unlawfully in approving and continuing to subsidize the Project without adequate SEQRA/CEQR review is necessary to remedy this unlawful conduct.

**THE PARTIES**

    3. Families United for Racial and Economic Equality ("FUREE") is incorporated in New York as a not-for-profit corporation and is tax-exempt under § 501(c)(3) of the Internal

1

Revenue Code. FUREE is composed of residents of Downtown Brooklyn and surrounding neighborhoods who support equitable and sustainable community development to ensure equal access to affordable housing, good jobs and support services for low income and working class families. FUREE is composed of mostly women of color who seek to win changes so that all work is valued and all people have the right to exit and remain out of poverty.

4.    Some members of FUREE live at locations within 100 yards of the Project. FUREE's office is located at 81 Willoughby Street, Brooklyn, NY 11201 which is within 1/10 of a mile of the Project. Members of FUREE face the effect of the construction in their neighborhood, the impact of low wages paid by the Developer Defendants on the economy of their community, and the demolition of their homes and forced displacement if the Project is allowed to go forward without regard to its environmental impact on their Brooklyn communities. For example:

A.    Joy Chatel, who resides at 227 Duffield Street, Brooklyn, NY 11201, lives right across the street from the Project and within the 2004 FEIS Study Area. Ms. Chatel is a member of FUREE. She is directly affected by the construction of the Project and will also be injured by the negative impacts on the community in which she lives.

B.    Tapan Das, who resides at 404 Albee Square, #21, Brooklyn, NY 11201, lives one block from the Project and within the 2004 FEIS Study Area. Mr. Das is a member of FUREE. His house is scheduled to be demolished to make way for Willoughby Park and an underground parking lot and he is being displaced from his residence by this summer. He is directly affected by the construction of the Project and will also be injured by the negative impacts on the community in which he lives.

2

C.    Since 1973, Celina Lynch has lived at 36 St. Edward's Street, Apt. 6F, Brooklyn, NY 11205 in the New York City Housing Authority Ingersoll Houses which is adjacent to the Study Area of the 2004 FEIS. Her residence is one-half mile from the City Point Project. Ms. Lynch has been a member of FUREE since approximately 2009, and has been a Board member of FUREE since 2010. She is very concerned about the growing lack of affordable housing in the community which is a problem increased by the many new luxury residential buildings. It appears to Ms. Lynch that the City and the developers are making plans to change the economic character and racial makeup of the community since so many new buildings do not provide housing that is affordable by the current residents of Downtown Brooklyn and surrounding neighborhoods. Ms. Lynch frequently walks through the neighborhood by the Project and covers her mouth when she is near the Project because of all of the dust caused by the construction. Ms. Lynch is employed by the New York City Housing Authority at Ingersoll Houses as a part-time resident supervisor earning $12.75 per hour for 15-20 hours per week. She has worked in that job since December, 2011 and has not received any increase in pay in that time. She is concerned that reducing the pay for construction workers in the area could result in a ripple effect that would prevent her from getting raises or finding better paying employment.

D.    Cuyler Cohen, Jr. has lived at 95 Navy Walk, Apt. 1B, Brooklyn, NY 11201, in the Ingersoll Houses which is adjacent to the Study Area of the 2004 FEIS, for 30 years. His residence is 0.3 mile from the City Point Project. Mr. Cohen has worked with FUREE on community development issues for years. He is very concerned about

3

the many luxury residential buildings in Downtown Brooklyn which are having the effect of displacing low and middle income residents of the neighborhood who cannot afford to live in the new apartments.  The new developments, including the City Point Project, have been planned, developed and carried out with little input or involvement of residents in the community in which the Projects are located.   Mr. Cohen is self-employed as a real estate consultant and has worked as a realtor in the community.  He is concerned that reducing the pay for construction workers in the area could result in a ripple effect that could generally depress wages in Downtown Brooklyn, adversely affecting his livelihood, and negatively impacting the community in which he lives and works.

5.      Metal Lathers Local 46 ("Local 46") is an unincorporated association under the law of New York, and a labor organization within the meaning of 29 U.S.C. § 152(5) with its principal place of business at 1322 Third Avenue, New York, NY 10021.  Local 46 has members who live within the neighborhoods adjacent to the Project who rightly fear that their wages will be depressed and their neighborhood conditions harmed by the Project.

6.      Ironworkers Local 361 ("Local 361") is an unincorporated association under the law of New York, and a labor organization within the meaning of 29 U.S.C. § 152(5) with its principal place of business at 89-19 97th Avenue, Queens, New York. Local 361 has members who live within the neighborhoods adjacent to the Project who rightly fear that their wages will be depressed and their neighborhood conditions harmed by the Project

7.      Ironworkers Local 580 ("Local 580") is an unincorporated association under the law of New York, and a labor organization within the meaning of 29 U.S.C. § 152(5) with its principal place of business at 501 West 42nd Street New York, NY 10036.  Local 580 has

4

members who live within the neighborhoods adjacent to the Project who rightly fear that their wages will be depressed and their neighborhood conditions harmed by the Project.

8.      Enterprise Association Steamfitters Local 638 ("Local 638") is an unincorporated association under the law of New York, and a labor organization within the meaning of 29 U.S.C. § 152(5) with its principal place of business at 32-32 48th Avenue, Long Island City, NY 11101. Local 638 has members who live within the neighborhoods adjacent to the Project who rightly fear that their wages will be depressed and their neighborhood conditions harmed by the Project.

9.      The Cement League, Incorporated ("Cement League") is a New York not for profit corporation constituting an association of employers in the concrete construction industry that employ union craftsmen and craftswomen in New York City performing work similar to the work that is required for the Project. The League's employers include Minority and Women Business Enterprises and many of the employees of the League's members are minorities and women. The employers who are members of the Cement League are restricted or are not properly able to submit bids to perform their jurisdictional work on the Project since the collective bargaining agreements applicable to the Cement League employers require fair construction industry wages and compel employer contributions to health, pension and other benefit plans. The Cement League employers are paying taxes that the City of New York is using to subsidize the Project despite the fact that the Developers are paying or intend to pay wages far below the prevailing rate and are not paying similarly required employment-related benefits to workers on the Project. The Cement League is more than 100 years old and is located at 49 West 45th Street, New York, New York 10036.

5

10.     New York City Councilwoman Letitia James is the representative of New York City Council District No. 35 which consists of many of the neighborhoods contiguous with and impacted by the Project, including Fort Greene, Clinton Hill, parts of Crown Heights, Prospect Heights and Bedford Stuysvesant.  Ms. James is Chair of the New York City Council Committee on Economic Development. Her office is located at 67 Hanson Place, Ground Floor, Brooklyn New York 11217.

11.     Walter T. Mosley currently serves as the New York State Assembly Member for the 57th District, which consists of many of the neighborhoods contiguous with and impacted by the Project, including Clinton Hill, Fort Greene, Prospect Heights, parts of Crown Heights and Bedford-Stuyvesant. He serves on the Codes; Housing; Cities; Banks; and Corporations, Authorities and Commissions Committees. His office is located at 55 Hanson Place, Brooklyn, NY 11217.

12.     Michael Bloomberg ("Bloomberg") is Mayor of the City of New York who directed and approved the issuance of a 2007 Modification Technical Memorandum which failed to address the impact on Brooklyn's communities of the decision to allow the Project developers to pay minimum wages to the construction workers who build the Project.  His office is located at City Hall, New York, NY 10007. Bloomberg approved the lease of New York City owned land that permitted the Developer Respondents to pay minimum, poverty level wages on the Project.  On information and belief, Bloomberg approved the failure of Deputy Mayor Robert K. Steel to respond to Petitioners' request for a supplemental environmental impact review of the Project.

6

he top margin

13.     Robert K. Steel ("Steel") is the Deputy Mayor of the Office for Economic Development and Rebuilding which is the lead agency charged with conducting environmental review of the Project under SEQRA and CEQR and who refused to respond to the request of certain of the Petitioners to conduct a supplemental environmental review of the Project. His office is located at 253 Broadway, 14th floor, New York, NY 10007.

14.     The New York City Department of Housing Preservation and Development ("NYCHPD") is an agency of the City of New York charged with the responsibility of ensuring compliance with SEQRA for real estate projects for which it provides subsidies. Its office is located at 100 Gold Street, New York, NY 10038. NYCHPD has provided financial support for the Project and is considering providing additional financial assistance for the Project.

15.     The New York City Economic Development Corporation ("NYCEDC") is an agency of the City of New York which is authorized to make available publicly subsidized bonds for lawful real estate projects build within the City of New York. Its office is located at 110 William Street, New York, NY 10038. NYCEDC has provided financial support for the Project and is considering providing additional financial assistance for the Project.

16.     The New York City Housing Development Corporation ("NYCHDC") is an agency of the City of New York which is authorized to make available publicly subsidized bonds for lawful real estate projects build within the City of New York. Its office is located at at 110 William Street, New York, NY 10038. NYCHDC has provided financial support for the Project and is considering providing additional financial assistance for the Project.

Supreme Court Records OnLine Library - page 8 of 39

17.     Acadia Realty Trust ("Acadia") is an equity real estate investment trust registered in the State of Maryland which holds title to the Project through Acadia Realty Acquisition III LLC. Acadia is located at 1311 Mamaroneck Avenue, Suite 260 White Plains, NY 10605.

18.     Albee Development LLC ("Albee Development") is a New York limited liability company formed on February 6, 2007 and currently located at c/o Arcadia Realty Trust, 1311 Mamaroneck Avenue, Suite 260, White Plains New York 10605.  Albee owns the leasehold in the Project now being developed by the other Developer Respondents.

19.     Washington Square Partners, Inc. ("WSP") is a New York Corporation formed on November 1, 1994 which is an equity owner of the Project in partnership with Acadia.  WSP is located at 201 East 42nd Street, New York, New York 10017.

20.     BFC Partners Development LLC ("BFC Partners") is a New York limited liability corporation formed on July 23, 2007 is the developer of Tower I of the Project. BFC Partners is located at 150 Myrtle Avenue, Suite 2, Brooklyn, NY 11201.

## VENUE

21.     This proceeding is properly venued in New York County as that is the county in which the City Respondents maintain their principal offices and is the location where the determination seeking to be annulled was made.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### I.     THE PROJECT REQUIRES A LEGALLY COMPLIANT ENVIRONMENTAL IMPACT STATEMENT TO PROCEED

22.     Chapter 5: Rules of Procedure for City Environmental Quality Review ("CEQR Rules") implements § 192(e) of the New York City Charter which provides that the City Planning Commission shall oversee implementation of laws that require environmental reviews

8

of actions taken by the City. Section 5.02(d) of the CEQR Rules makes these Rules applicable to any environmental review by the City that is required by SEQRA and the regulations of the State Department of Environmental Conservation and further provides that the CEQR Rules shall not be interpreted to dispense with any such review where it is otherwise required.

23.     The New York State Environmental Quality Review Regulations ("SEQRA Regulations") appear at Part 617 of the Rules of the Department of Environmental Conservation. Part 617.3(a) provides, as a General Rule, that no agency involved in an action may undertake or fund an action unless it has complied with SEQRA and no project sponsor may commence any physical alteration related to an action until there has been compliance with the provisions of SEQRA. Part 617.3(c) provides that an application for agency funding or approval of a Type I action will not be complete until a negative declaration has issued or until a draft of an Environmental Impact Statement ("EIS") has been accepted by the lead agency as satisfactory with respect to scope, content and adequacy.

24.     Section 617.4(a) of the SEQRA Regulations identifies the Type I actions that are more likely to require the preparation of an EIS. Section 617.4(b) identifies a non-exhaustive list of the actions that constitute Type I actions, including "in a city, town or village having a population of more than 150,000, a facility with more than 240,000 square feet of gross floor area." § 617.4(b)(6)(v). The Project has over 600,000 square feet of floor area, is plainly a Type I action under the SEQRA Regulations, and is therefore also a project requiring an EIS under the CEQR regulations as well. Even in the absence of this specific State regulatory requirement that has been adopted by the City, the sheer size of the Project would require an EIS under any reasonable interpretation of the combined SEQRA and CEQR law and regulations.

9

25.     The City Environmental Quality Review Technical Manual ("CEQRTM") further elaborates on the types of projects that require an EIS, including those for which the City provides financial assistance. (Chapter One, ¶ 100, a copy is attached as Exhibit A.) The CEQRTM cites 6 NYCRR 617.4(a) as the source of "those actions and projects that are more likely to require the preparation of an EIS than Unlisted actions." (Exhibit A, ¶ 121.) Since the Project has received millions of dollars in financial assistance from the City and is seeking millions of dollars more in financial assistance, CEQR requires that an EIS be completed for the Project.

26.     NYCEDC entered into a lease agreement with Albee Development in 2007 to develop the Project on New York City owned land at the intersection of DeKalb and Flatbush Avenues in Brooklyn ("the Lease"). (A copy of the Lease is attached as Exhibit B.) The Project has had extraordinary levels of public assistance since its inception. The first phase of the Project consisted of a 50,000 square foot retail building. NYCEDC and the New York City Capital Resource Corporation subsidized the construction of this retail building by allocating $20 million in Recovery Zone Facility Bonds, which were tax-exempt bonds authorized under the 2009 American Recovery and Reinvestment Act.

27.     The Project's next phase, Phase II, has already begun and will include approximately 600,000 square feet of additional retail space and two residential towers to be constructed above the retail space. "Tower 1," developed by BFC Partners and financed by the NYCHDC will contain approximately 250 units, one-half of which will allegedly be earmarked as affordable housing. "Tower 2," developed by The Brodsky Organization and Michael Field,

10

will contain approximately 440 market rate apartments. The Developer Respondents have publicly claimed that Phase II will create 3,780 construction jobs.

28.     The Project's 650,000 square feet of retail space and 650 rental units are receiving a combination of subsidies from public funds, publicly backed bonds and tax abatements and credits valued at over $50,000,000. For example, in addition to the $20 million in Recovery Zone bonds, the Project obtained $20 million in federal new market tax credits in the fall of 2012 to be used for the retail component of Phase II. http://nyrej.com/57802 (last visited April 5, 2013.)

29.     The Respondent Developers, Acadia and WSP, paid very low wages and absolutely no benefits to the construction workers who performed the labor necessary to construct Phase I of the Project and, on information and belief, intend to continue to pay low wages and no benefits to many of the 3,780 construction workers who will build Phase II of the Project.

30.     On information and belief, BFC Partners is also planning to pay very low wages to the construction workers who will build their portion of Phase II of the Project.

## II.   THE ENVIRONMENTAL IMPACT OF THE 2013 PROJECT WAS ALLEGEDLY ANALYZED IN 2004

31.     The only environmental impact statement ever done pursuant to SEQRA and CEQR that addresses the Project is the Final Environmental Impact Statement issued on April 30, 2004 ("2004 FEIS") by the Office of the Deputy Mayor for Economic Development and Rebuilding regarding Downtown Brooklyn development. (A copy of the Executive Summary and Chapters 3 and 9 of the 2004 FEIS is attached as Exhibit C.) The 2004 FEIS was supported by a mere two days of public hearings held on March 24, 2004 and April 7, 2004, 9 years ago, when Downtown Brooklyn was a very different place.

11

32. The 2004 FEIS revised the Draft EIS, issued on November 28, 2003, to account for a potential mixed use arena development in the Atlantic Terminal Area of Brooklyn that could affect the conditions assessed in the 2003 Draft EIS. The Study Area of the 2004 FEIS encompasses most of Downtown Brooklyn. (Exhibit C at Figure S-1.)

33. The 2004 FEIS identified a probable impact in six different areas of the 13 separate and distinct public approvals and changes to existing zoning and density rules required by proposed development: Historic Resources; Hazardous Materials; Traffic; Transit and Pedestrians; Air Quality; and Noise. The 2004 FEIS forecast some potential negative impacts in each of those areas under the Downtown Brooklyn Development Plan and suggested possible steps to mitigate the expected impacts on the environment. The 2004 FEIS made no effort to assess the socioeconomic impact of very low wages being paid to construction workers on the Project because its drafters erroneously assumed that the Project would pay its construction workers the prevailing wages for their crafts as established by the New York City Comptroller.

34. In July, 2007, New York City issued a Modification Technical Memorandum ("2007 MTM") to the 2004 FEIS in order to assess if changes proposed for the Albee Square Mall area (the site of the Project) warranted the creation of a supplemental EIS under CEQR. (A copy of the 2007 MTM is attached as Exhibit D.) In 2007, the City concluded that no new significant environmental impacts would be created and that a Supplemental EIS was not necessary for the Project. The 2007 MTM also failed to address the socioeconomic impact of very low wages for the Project.

35. In 2008, FUREE requested that Pratt Center for Community Development prepare an analysis of the unanticipated impacts of rezoning and development on downtown Brooklyn

12

residents and businesses ("the 2008 FUREE Report") which demonstrated that the 2004 FEIS did not take into account many of the negative impacts on residents and businesses arising from the Downtown Brooklyn development projects purportedly addressed in the 2004 FEIS. (A copy of the 2008 FUREE Report is attached as Exhibit E.)

36.    The 2008 FUREE Report showed that the 2004 FEIS estimate of 100 local businesses being directly displaced by the Project greatly understated the potential for business displacement. (Exhibit E at 11-14.) The 2004 FEIS assumed that there would be a substantial increase of office space and related employment in Downtown Brooklyn that has not occurred. (Exhibit E at 15-16.) The 2004 FEIS greatly understated the number of luxury and market rate housing units that would be included within the Downtown Brooklyn development area. (Exhibit E at 17.) The 2008 FUREE Report correctly forecast that the new residents who would come into the area would create significant impacts on the neighborhood character of the Downtown Brooklyn development area. (Exhibit E at 18-20.)

37.    The Project purports to include an affordable housing component but a simple analysis of the individuals entitled to participate in the so-called affordable housing demonstrates that this is a sham. Only one of the two residential towers in Phase II (the portion of the Project being built by BFC Partners with 250 units) is utilizing the NYCHDC 50/30/20 program under which NYCHDC provides low-interest loans to multi-family rental buildings in which half of the units may be rented at market rates if 1) 20% of the apartments are restricted for low-income tenants (40% to 50% of the Area Median Income ("AMI")), and 2) 30% are reserved for middle-income tenants (175% to 200% of AMI). (A copy of a description of HDC's Mixed Income Program is attached as Exhibit M.) Thus, only 125 of the 650 housing units in the Project are

13

even labeled as "affordable housing." Of the 125 so-called affordable housing units, 72 units will be for so-called middle income families and 48 for low income families. The other 530 units are simply market rate apartments far out of the reach of the members of Petitioners.

38.     But the so-called affordable housing component is unobtainable by existing Downtown Brooklyn residents as well. NYCHDC defines the AMI for middle income units for a family of four as $85,900. (A copy of the NYCHDC Income Eligibility Criteria is attached as Exhibit N.) Thus, the 72 "middle income" units at 175%-200% of AMI will be available for 4 member families earning a yearly income between $150,325 and $171,800, which includes many professionals not popularly understood to be appropriate candidates for publicly supported housing.

39.     The 48 units reserved for families with incomes up to 40% to 50% AMI (or, for a family of four, $34,360 to $42,950) is still in excess of what could be afforded by anyone who is receiving the poverty level wages that were paid under Phase I of the Project and are likely to be paid under Phase II of the Project, or who will be employed in the retail component of the ·project which optimistically projects wages of $13 an hour for retail employees. (The NYCCRC Project Cost/Benefit Analysis, dated September 10, 2009, and submitted by Albee is attached as Exhibit O, at 24.) The yearly income of a retail employee earning $13 an hour is unlikely to exceed $26,000, barely enough to rent even a studio for one person in the Project. The tens of millions of dollars being spent by the City to produce 48 housing units for arguably middle income people could be more intelligently spent to provide sorely needed housing for workers that the Project is displacing in the adjacent communities.

14

40.    SEQRA and CEQR define the term "environment," as "the physical conditions which will be affected by a proposed action, <u>including</u> land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, <u>existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character.</u>" ECL 8-0105 [6]; CEQR 1 [f]. (Emphasis added.) ·

41.    The 2004 FEIS does not address the cumulative impact of the massive development that occurred from 2004 through the end of 2012 in the Flatbush corridor on the patterns of population concentration, distribution, or growth, and existing community or neighborhood character of Downtown Brooklyn. The potential acceleration of the displacement of local residents and businesses is a secondary long-term effect on population patterns, community goals and neighborhood character that SEQRA and CEQR require to be considered in an environmental analysis. Under SEQRA and CEQR the fact that the actual construction on a proposed site will not cause the displacement of any residents or businesses is not dispositive for displacement can occur in the community surrounding a project as well as on the site of a project. SEQRA and CEQR do not merely require that the displacement caused by the actual physical construction on any one site or series of sites be considered. CEQR specifically requires that "[f]or the purpose of determining whether an action [may have a significant effect on the environment], the action shall be deemed to include other contemporaneous or subsequent actions which are included in any long-range comprehensive integrated plan of which the action under consideration is a part." CEQR 6 [b]; *see*, 6 NYCRR 617.11 [a] [11] [b].

15

III.   THE ENVIRONMENTAL ANALYSIS OF THE PROJECT DOES NOT
       ADDRESS THE IMPACT OF POVERTY LEVEL WAGES ON THE AFFECTED
       COMMUNITIES

   A.   The 2004 FEIS And 2007 MTM Did Not Analyze The Impact Of The
        Project's Low Wages

   42.   The Project is being constructed on land owned by the City of New York. In

2007, Mayor Bloomberg or his designees, proposed the 99-year Lease to the Developer

Respondents for the Project. The Lease has a provision regarding the wages that must be paid to

the construction workers who labor to construct the Project. Section 10.04 provides that "all

persons employed by Tenant with respect to Construction Work, shall be paid, without

subsequent deduction or rebate unless authorized by law not less than the minimum hourly rate

required by law." (Exhibit B at 36-37.) The Lease thus expressly authorizes, indeed invites, the

Developer Respondents to pay as low as the New York State minimum hourly rate, currently

$7.25 per hour, without benefits, to construction workers who build the project.

   43.   The Comptroller of the City of New York establishes the prevailing hourly wages

and benefits in the City of New York for construction workers. The current prevailing hourly

rate for Laborers, for example, is $38.70 for hourly wages and an additional hourly sum of

$31.75 for benefits including retirement benefits, health insurance, dental insurance, sick pay,

vacation pay, and holiday pay which amount to a prevailing hourly wage of $69.45 for work

similar to work on the Project. (A copy of the Comptroller's § 220 Prevailing Wage Schedule

effective July 1, 2012-June 30, 2013 for Laborers is attached as Exhibit F.)

   44.   On October 5, 2012, counsel for the Petitioners wrote to Acadia advising it that

they had reason to believe that on Phase I the construction workers were paid an hourly wage of

$15 for hours worked with no benefits at all – no retirement benefits, no health insurance, no

16

dental insurance, no sick pay, no vacation pay, and no holiday pay -- and requesting information on the Project concerning the labor conditions, safety record and extent of public financing. ("October 5, 2012 Letter"). (A copy of the October 5, 2012 Letter is attached as Exhibit G.)

45.     On October 16, 2012, Acadia replied to the October 5, 2012 Letter ("October 16, 2012 Letter"). Acadia did not provide any of the requested information regarding the wages, paid time off or employment benefit information requested by the October 5, 2012 Letter. Instead, Acadia advised that: "Although many of your statements are untrue, we do not believe that a letter is the appropriate forum in which to educate you as to the actual facts regarding the City Point Project" and failed to respond to the request for information. (A copy of the October 16, 2012 Letter is attached as Exhibit H.)

46.     One of the contractors working at City Point is Casino Development Group, Inc. ("Casino"), a contractor that does not have a contract with the Unions. Workers on sites where Casino functions as a contractor report that they are paid between $12 and $20 per hour. (A copy of the Affidavit of Byron Schuler is attached as Exhibit P.)

47.     Acadia specifically refused to agree to pay construction workers on the Project the prevailing wages and benefits that have been established by the Comptroller of the City of New York as appropriate for construction projects in New York City.

48.     The 2004 FEIS purportedly reviewed the effect of the proposed changes resulting from development in Downtown Brooklyn on the Socioeconomic Conditions of the Study Area. The review included information about the total number of employees in each industry in the Study Area. (2004 FEIS at 3-20 – 3-24.) However, this information did not include any analysis of wage rates in the Study Area. The 2004 FEIS assumed that the entire project would create

17

10,042 person years of direct construction employment producing wages and salaries of $585.33 million or an average person year wage or salary of $58,288. (Exhibit C at 3-46, Table 3-23.) This analysis establishes that the 2004 FEIS drafters assumed that construction workers on the Project would be paid the prevailing wages established by the Comptroller of the City of New York for their work.

49.    The 2004 FEIS also assumed that 20,671 permanent jobs would be created by the entire project resulting in wages and salaries paid of $1.024 billion or an average wage or salary of $49,093. (Exhibit C at 3-48, Table 3-24.) The wage and salary assumptions used to arrive at the total wages and salaries was "[b]ased on average salaries by economic sector in Brooklyn from the New York State Department of Labor." (Exhibit C at 3-48.) The 2004 FEIS concludes that "[t]he approximately 1,670 new residents and 19,124 new employees expected to result from the projected developments would likely be similar in socioeconomic characteristics to residents and employees that would populate the area in the future without the proposed actions." (Exhibit C at 9-15.)

50.    The 2007 MTM specifically addressed changes to Site Q, the site on which the Project sits, from the proposed project in the 2004 FEIS. The 2007 MTM determined that a supplemental EIS was not needed due to these changes because

> neither the changes in the project program nor background conditions would create any significant adverse environmental impacts that were not identified in the 2004 FEIS. Furthermore, there are no changes in circumstances surrounding the project, nor is there any newly discovered information that would create any new significant adverse environmental impacts.

(Exhibit D at 1.)

18

51.    The 2007 MTM concluded that the major changes to the proposal for Site Q were that: the building would be primarily occupied with residential, rather than office uses; the building would include an approximately 404-space accessory parking facility, instead of a 225-space accessory parking facility; and the tower portion of the building would be approximately 764 feet in height, rather than 615 feet.  (Exhibit D at 1.)

52.    The 2007 MTM Socioeconomic Conditions review consists of less than one page. (Exhibit D at 11.)  It states that the revised plan for Site Q would result in the displacement of businesses which employed 332 workers in 2007 but that such displacement did not meet the criteria for significant adverse displacement as outlined in the 2001 CEQR Technical Manual and represented less than 1 percent of the 2002 total Study Area employment as reported in the 2004 FEIS.  (Exhibit D at 11.)  However, the January, 2012 CEQR Technical Manual states that the circumstances that would typically require a socioeconomic assessment include a project that "would directly displace more than 100 employees."  (A copy of Chapter 5 of the 2012 CEQR Technical Manual is attached as Exhibit I, at 5-3.)  Since Site Q has resulted in the displacement of businesses which employed over 100 employees, a socioeconomic assessment should plainly be conducted.

53.    The 2007 MTM did no further job analysis of the revised plan for Site Q but included information from which it can be determined that the projected employment at Site Q would be greatly reduced compared to the original plan for Site Q.  The 2007 MTM includes a chart which compares the square footage for each use (office, retail, residential, accessory parking).  It states that based on that square footage, "The Site Q development would be expected to generate approximately 2,234 residents, 38 employees related to the residential

19

building, 506 commercial office employees, 7 parking garage employees, and 1,039 retail employees." (Exhibit D at 3.)

54.     Applying the same formulae to the previously proposed Site Q development would have resulted in approximately 4,932 commercial office employees, 5 parking garage employees, and 1,038 retail employees for a total of 5,974 employees. The 2007 plan, which greatly reduced the commercial office space, was projected to result in only 1,590 employees, 73 percent fewer employees than initially planned. However, the 2007 MTM did not even refer to this reduction in projected employment.

**B.     Good Construction Jobs Are Vital For Brooklyn's Economy**

55.     Construction industry wages are a critical component of New York City's middle class. On December 17, 2012 the New York Building Congress issued an analysis of the U. S. Census Bureau's American Community Survey that found that there are 224,878 men and women in New York City's construction industry. (A copy of the webpage of the Building Congress containing the report is attached as Exhibit J.) Seventy-four percent, 166,632, live in the five boroughs. Brooklyn alone has 49,582 construction workers. The construction industry is a critical provider of jobs for Latino (80,331), African American (30,720), and Asian (16,085) New Yorkers.

56.     The New York Building Congress recently reported that construction spending in New York City was $30.6 billion in 2012, a 3.6 percent increase over the prior year and the highest level since 2008. Of the three major market segments of the construction sector, government is by far the largest, accounting for slightly over half ($15.6 billion) of the total market in 2012. Residential construction totaled $5.1 billion in 2012, and non-residential

20

construction, such as office buildings, hotels, and entertainment and sports facilities, amounted to

$9.8 billion.[1] (A copy of the Affidavit of James Parrott, sworn to on April 5, 2013 ("Parrott

Aff."), is attached as Exhibit K, ¶ 4.) Payroll employment in construction averaged nearly

115,000 in New York City in 2012, with total wages approximating $8.1 billion.[2] (Parrott Aff., ¶

5.)

57.    For over a half century, the construction sector has been a major source of middle

class jobs for blue collar New Yorkers. It has been a sector where a worker could go from high

school to a 4- or -5-year union-sponsored building trades apprenticeship program that combines

classroom instruction, health and safety training, and on-the-job experience working side-by-side

with skilled journeymen trades workers. The worker would receive decent hourly wages,

overtime pay, health and retirement benefits. (Parrott Aff., ¶ 6.)

58.    It is no wonder that workforce development professionals across the city point to

the building trades apprenticeship programs as the model for building worker skills and as the

best means to ensure the upward career mobility of non-college educated city residents. (Parrott

Aff., ¶ 7.)

59.    Over the past decade, construction has been a mainstay of the critical, but

shrinking, blue collar sector in New York City. While there are some blue collar occupations

within the service sector, such as janitors, the bulk of blue collar jobs are found in four sectors:

construction, manufacturing, transportation, and wholesale trade. Between 2000 and 2011, New

---

[1] New York City Building Congress, *Spurred by a Rise in Residential Construction, Annual NYC Construction Spending Tops $30 billion for First Time Since 2008*, Construction Outlook Update, March 21, 2013.

[2] Analysis of James Parrott of New York State Department of Labor, Quarterly Census of Employment and Wage data.

21

York City employment in these four blue collar sectors shrank by 25 percent. However, the number of construction jobs was down only slightly in 2011 compared to 2000. On a payroll employment basis, in early 2013, construction accounts for about 115,000 out of the 455,000 jobs in these four blue collar sectors in New York City.[3] (Parrott Aff., ¶ 8.)

60.    By its very nature, construction work is project-based, with any given building project providing only temporary work. Union membership and contractual protections made it easier for workers to survive in an uncertain work environment. Union coverage meant that employers paid into government-sponsored social insurance programs providing unemployment compensation and workers' compensation so that laid-off or injured construction workers were protected by those critical programs. Several studies have found that the misclassification of workers as independent contractors is particularly prevalent in the construction sector in New York City and New York State.[4] A 2007 study by the Fiscal Policy Institute estimated that there were 50,000 workers in the New York City construction industry who were either misclassified as independent contractors or employed by construction employers completely off the books.[5] (Parrott Aff., ¶ 9.)

---

[3] Analysis of James Parrott of New York State Department of Labor, Quarterly Census of Employment and Wage data.

[4] A team of researchers from the Cornell Industrial and Labor Relations School examined unemployment insurance audits to gauge the extent of employee misclassification in New York. Their study estimated that about 750,000 New York workers were misclassified as independent contractors. For the 2002 to 2005 period of the Cornell study, misclassification affected 10.3 percent of all New York private sector workers. In the construction industry, which was a special focus of the Cornell report, misclassification affected over 45,000 workers, 14.8 percent of all construction workers. Linda H. Donahue, James Ryan Lamare, and Fred B. Kotler, *The Cost of Worker Misclassification in New York State*, Cornell University ILR School, February 2007. See, also, Fiscal Policy Institute, *New York State Workers' Compensation: How Big Is the Coverage Shortfall?* January 25, 2007.

[5] Fiscal Policy Institute, *Building Up New York, Tearing Down Job Quality. Taxpayer Impact of Worsening Employment Practices in New York City's Construction Industry*, December 5, 2007. James Parrott was the principal author of the 2007 FPI report.

22

61.     Construction is one of the most dangerous occupations there is. Union-sponsored health-and-safety training programs and safety practices have helped keep construction accidents to a minimum.[6] (Parrott Aff., ¶ 10.)

62.     Prevailing wage standards, building trades collective bargaining agreements and the apprenticeship system they sustain, and the union structures themselves, are at the very heart of what has made the construction sector historically a source of solid middle class jobs, providing middle class living standards for workers on the job, and a secure retirement when they reach that stage in their lives. Now, however, the middle class nature of the construction sector is being called into question. When developers seek to do an end run around the building trades, they weaken prevailing wage standards, jeopardize safe construction practices, and undermine the capacity of the apprenticeship system to give workers the vocational skills they need to build their own career ladders into the middle class. (Parrott Aff., ¶ 11.)

63.     Non-prevailing wage construction work epitomizes the phrase, "penny-wise but pound-foolish." It may seem cheaper, but it is no bargain. With its spread, non-prevailing wage construction not only reduces workers' wages, frays the social insurance safety net, lessens the quality of construction and worsens safety practices, but it dismantles the apprenticeship system and destroys the middle class. It means a downward spiral in pay, benefits, skills, quality, opportunity, and ultimately, in the stability of neighborhoods and the broader social fabric. In a city where there has been no progress in reducing poverty for two decades,[7] reducing job quality and opportunities for upward mobility into the middle class for non-college-educated workers is

---

[6] See, Fiscal Policy Institute, *The Economic Development Benefits of Prevailing Wage,* May 2006.

[7] According to the Current Population Survey, New York City's poverty rate for 1987/88 was 22.2 and in 2010/11 it was 22.5. Analysis by James Parrott.

23

the antithesis of progress. American Community Survey data indicate that for the past several years poverty has been higher in Brooklyn than for New York City overall. In 2010, 41.3 percent of Brooklyn's population was either poor or "near poor," that is with incomes between 100 and 200 percent of the poverty line.[8] (Parrott Aff., ¶ 12.)

64.     The increase in non-prevailing construction in New York City in recent years has eroded the pay and benefits for New York City and Brooklyn construction trades workers. Over the past decade, the median hourly wage for construction trades workers (union and non-union) who live in New York City has declined by over 8 percent in inflation-adjusted terms, from $17.44 (in 2012 dollars) in the 2001/03 period to $16.00 an hour in the 2010/12 period.[9] (Parrott Aff., ¶ 13.)

65.·     One indication of the erosion in labor practices in construction in Brooklyn is the sharp increase in the number of construction workers misclassified as so-called "independent contractors". The U.S. Census Bureau uses IRS records to compile the number of "nonemployers," representing individuals who were paid on a 1099-basis, i.e., as contractors rather than as employees.[10] In construction, these workers cannot be considered self-employed since they are not receiving business income and they do not employ other workers. Essentially, nonemployers in construction are misclassified independent contractors. The number of such Brooklyn workers grew from 14,321 in 2005 to 19,305 in 2010, a 34 percent increase over just five years. Average "receipts" for misclassified construction workers were only $21,165 in

---

[8] American Community Survey data analyzed by James Parrott.

[9] American Community Survey data analyzed by James Parrott.

[10] U.S. Census Bureau, Nonemployer Statistics. http://www.census.gov/econ/nonemployer/.

24

2010[11], less than 60 percent of the $35,959 average wage earnings for trades workers on the payroll of a construction employer.[12] (Parrott Aff., ¶ 14.)

66.     Non-prevailing wage construction workers are much less likely to be covered by employer-provided health insurance. Based on American Community Survey data for 2011, about 114,000 construction workers employed in New York City had employer-provided health insurance. However, some 60,000 construction workers were uninsured.[13] City Point's Phase I exacerbated this trend by providing no health benefits for any construction workers.[14] (Parrott Aff., ¶ 15.)

67.     When construction companies fail to provide health benefits, the health care costs get shifted to the workers themselves, taxpayers and union employers. In 2011, 12 percent of construction workers in the city were covered by Medicaid, which is paid by taxpayers. When an uninsured construction worker gets injured and goes to the hospital, uncompensated care is provided and union employers get stuck with the tab through a surcharge collected under the state Health Care Reform Act (HCRA). Based on studies from the Urban Institute and the United Hospital Fund, the estimated cost of uncompensated care per construction worker receiving uncompensated care is $2,500. (Parrott Aff., ¶ 16.)

68.     Like New York City overall, Brooklyn is a borough with some high-income, some middle-income and some low-income neighborhoods. Census Bureau data for 2000 and

---

[11] Analysis of Census Nonemployer statistics by James Parrott.

[12] According to the 2009-11 ACS, annual average earnings for Brooklyn residents who were construction trades workers working in Brooklyn were $35,959.

[13] Analysis of 2011 American Community Survey microdata by James Parrott.

[14] Letter from Thomas M. Kennedy, Kennedy, Jennik & Murray, P.C., to Kenneth F. Bernstein, President and Chief Executive Officer, Acadia Realty Trust, October 5, 2012. (Exhibit G.)

25

2010, however, show that incomes generally rose in high-income neighborhoods while they were flat or declined in low- and middle-income neighborhoods. That's true for other boroughs and for Brooklyn, the most populous of the five boroughs. (Parrott Aff., ¶ 17.)

69.     With its downtown Brooklyn location near Flatbush Avenue, the City Point project is surrounded by the two highest income neighborhoods in Brooklyn—Park Slope/Carroll Gardens (median income $116,000) and Brooklyn Heights/Fort Greene ($91,000)—and two of the lowest-income neighborhoods—Bedford Stuyvesant and Prospect Heights/North Crown Heights (both with median family incomes of $40,000). In the latter two neighborhoods, 42-47 percent of families live in poverty or near-poverty (100-200 percent of the poverty line), twice the rate for the two richer neighborhoods.[15] (Parrott Aff., ¶ 18.)  For example, in 2011, the Average Median Income for Census Tract 29 containing the Whitman Houses and Farragut Housing Projects was only $9,001.

70.     In a socio-economic setting with rich and poor side-by-side, middle class incomes are critically important. Good-paying, blue collar jobs such as the construction sector offers under prevailing wage conditions, should be among the highest priorities for government and civic leaders. Government-subsidized real estate development projects, such as City Point, should be one of the surest ways for leaders to support middle class job opportunities. (Parrott Aff., ¶ 19.)

71.     Based on American Community Survey data, there are about 2,300 construction workers working in Brooklyn who live in the four neighborhoods surrounding the City Point

---

[15] Analysis of 2010 American Community Survey microdata by James Parrott.

26

project. The average annual earnings for these workers were $36,800 in the 2009/11 period.[16] This is below the average citywide for the construction sector and likely reflects the lower wages paid for residential construction and for nonresidential construction performed under non-prevailing wage conditions that is more prevalent in Brooklyn than in Manhattan. (Parrott Aff., ¶ 20.)

72.     Thus, high-profile projects like City Point that do not pay construction workers prevailing wages and benefits put significant downward pressure on average construction wages. Data from the Current Population Survey indicate that non-prevailing wage (non-union) construction workers in New York City typically are paid $15.00 an hour or less.[17] Assuming 1,500 hours of work per year, a typical non-union construction worker earns only $22,250 over the course of a year. This clearly means that an increase in non-prevailing wage practices in construction in downtown Brooklyn will seriously erode the living standards for construction workers in these neighborhoods. (Parrott Aff., ¶ 21.)

73.     The communities in the Study Area have been and are being harmed by the market impact of a large and prominent construction project with millions of square feet of commercial, residential and related space being built at wage rates that prevent a fully employed worker from maintaining a home in New York City. The poverty level for a family of four in New York City is $23,021. According to the Mayor's Center for Economic Opportunity,

---

[16] Estimates of James Parrott based on analysis of American Community Survey microdata, 3-year pooled data, 2009/2011.

[17] The median (that is, half of all workers earn less than that amount) hourly wage for non-union construction workers in New York City was $15.00 in 2012. Analysis of James Parrott of Current Population Survey data.

27

considering high local housing and other costs, a more accurate income threshold for poverty in New York City is $30,005.[18] (Parrott Aff., ¶ 22.)

74.     It seems that accurately reporting construction worker wages is a low priority in various project-related documents. The wage rate allowed by the 99-year City Point lease would allow a construction worker to earn as little as the minimum age, currently $7.25 an hour. For a 1,500-hour a year construction worker, that would mean annual earnings of $10,875, less than one half of the federal poverty line for a family, and just a little more than one-third of the family poverty level determined by the Mayor's Center for Economic Opportunity. (Parrott Aff., ¶ 23.)

75.     On the other hand, the Final Environmental Impact Statement for the Downtown Brooklyn Project cites the other end of the spectrum for construction wages. In making as strong a case as possible for a positive economic impact from the project, the FEIS uses a construction worker annual salary of $58,288 (in 2003 dollars). The FEIS estimates that the project would generate 10,042 person-years of construction employment with a wage and salary total of $585.33 million.[19] If this annual wage of $58,288 is expressed in 2012 dollars, it would be $74,433. That would make it well over three times as great as the wages that are typically paid on non-prevailing wage jobs in New York City and in Brooklyn. (Parrott Aff., ¶ 24.)

76.     The reality of today's construction labor practices demonstrates how wildly over-stated was the economic impact of the broader Downtown Brooklyn Project. The construction economic impact in the FEIS was over-stated by at least a factor of three. Nor did the FEIS

---

[18] For 2010, the Mayor's Center for Economic Opportunity estimates that the poverty rate for New York City is $30,005 (for the same year the comparable 4-person Census Bureau poverty rate was $22,113.) New York City Center for Economic Opportunity, *The CEO Poverty Measure, 2005-2010*, A Working Paper by the New York City Center for Economic Opportunity, April 2012, p. vi.

[19] *Downtown Brooklyn Development*, Final Environmental Impact Statement, CEQR#:03DME016K, April 2004, Table 3-23.

28

examine the adverse impact of the low wages that are being paid on the surrounding communities that are predominantly comprised of African-American and Hispanic populations. (Parrott Aff., ¶ 25.)

77.     According to the Self Sufficiency Standard for New York City, a four-person family comprised of two adults, a preschooler and a school-age child requires an income of $68,300 to provide for housing and basic necessities in Brooklyn without reliance on public or private subsidies.[20] The Self Sufficiency Standard family budget does not provide for any savings. At the typical $15 an hour non-prevailing wage rate for construction in Brooklyn, it takes three year-round construction jobs for a Brooklyn family to be self-sufficient. (Parrott Aff., ¶ 26.)

78.     City Point is expected to employ hundreds of construction workers working thousands of hours during its construction.  The impact of a large project being built at poverty level wages without benefits will be felt not only by the poorly paid workers on the City Point project but throughout the Downtown Brooklyn Study Area and the surrounding neighborhoods. Acadia is the tenth largest Real Estate Investment Trust in New York City. Using public subsidies to permit a major market player to drive down construction wages to poverty level will impact on every project built in the future. (Parrott Aff., ¶ 27.)

79.     Brooklyn's middle class is under attack and this project is contributing to that assault. The impact on Brooklyn's communities of taking away middle class construction jobs and replacing them with poverty level employment is completely predictable: home foreclosures; apartment evictions; marital strains and divorces; increased substance abuse and domestic

---

[20] Diana M. Pearce, *The Self-Sufficiency Standard for New York City 2010*, Prepared for the Women's Center for Education and Career Advancement, June 2010.

29

violence as families are driven to the edge of economic survival. However, there is nothing inevitable about this outcome. It will only happen if Brooklyn's and New York City's leaders stand by and permit public resources to be used to tear down middle class construction jobs rather than build up opportunities for Brooklyn residents to move into the middle class.  (Parrott Aff., ¶ 28.)

80.     FUREE and the Unions have hundreds of members who reside in the Northern Brooklyn communities adjacent to the Project and who have been harmed by the decision by the City of New York and the Developer Respondents to pay only a fraction of the otherwise prevailing wages to construction workers on these projects. FUREE has members who reside within one hundred yards of the Project that were deprived of the opportunity to achieve a job at prevailing construction wages and are slated to have their homes demolished as part of the Project.

## IV.   THE 2004 FEIS FAILS TO ADDRESS THE CUMULATIVE IMPACT ON DOWNTOWN BROOKLYN OF THE MASSIVE DEVELOPMENT THAT HAS ALREADY OCCURRED IN THE FLATBUSH CORRIDOR

81.     The massive development occurring in Downtown Brooklyn exceeds anything contemplated by the 2004 FEIS. According to the Downtown Brooklyn Partnership, since 2006, Downtown Brooklyn has experienced $4.9 billion in private investment, including 7,111 residential units, 1,570 hotel rooms, 1.4 million square feet of retail space and a total of 11.9 million square feet of real estate development. See http://assets.downtownbrooklyn.com/maps/Development-Map-Mar-2013.pdf (last visited March 26, 2013.) The Downtown Brooklyn Partnership published a report on July 25, 2012 asserting that since 2006, Downtown Brooklyn has received $3.5 billion in new private investment,

30

leading to the creation of 7.9 million square feet of new space. This includes 5,200 new residential units (40% of which are owner-occupied), more than 1,000 new hotel rooms, 237,000 square feet of office space, and 590,000 new square feet of retail space.  See http://assets.downtownbrooklyn.com/documents/DBP-Strategic-Plan-07-25-12.pdf (last visited March 26, 2013.)

82.    On March 14, 2013, *Crain's New York Business* noted "[t]he forest of apartment towers that has sprouted in downtown Brooklyn in recent years" and argued that this forest "may just be the beginning of the area's upward growth", predicting "a second wave to the recent construction boom." http://www.crainsnewyork.com/article/20130314/REAL_ESTATE/130319924 (last visited on April 4, 2013.)

83.    *Crain's* reported that "in the next two to three years alone, 14 new residential properties with a combined 4,746 units will be completed" and that "[a]bout half of these projects are already rising", and "the other half are currently in the development process". (*Id.*) *Crain's* predicted that when these new projects are completed, Downtown Brooklyn's population will rise from a little more than 13,000 to well over 25,000. (*Id.*)

84.    These projects impose on the Downtown Brooklyn communities over 7,000 units of housing.  In addition, attractions such as the nearby Barclay Center bring thousands of visitors to this community every week.  These tens of thousands of new residents and visitors strain an already overcrowded Downtown Brooklyn school system, park system, transit system and police and fire departments.  The issue in this case is not the wisdom of changing the landscape of Brooklyn to resemble sections of Manhattan but the City Respondents' total failure to respect the

31

requirements of SEQRA and CEQR in continuing to not only approve but subsidize the Project without any consideration of the facts on the ground since 2004.

## V.   THERE HAS BEEN NO "HARD LOOK" AT THE PROJECT

85.   The Office of the Deputy Mayor for Economic Development and Rebuilding is the Lead Agency under SEQRA and the primary reviewing and permitting agency for the decision to award subsidies for the Project. NYCHPD accepted without any independent review, the representations by the Respondent Developers that the Project would be beneficial for the Downtown Brooklyn communities without any analysis of the impact of paying poverty wages. Any NYCHPD decision to award subsidies to the Project would be illegal, arbitrary and capricious because it failed to have any independent review whatsoever of the Respondent Developers' claims under SEQRA and CEQR. NYCHPD also failed to consider whether the post-2004 development along the Flatbush Corridor rendered the Project a burden on Downtown Brooklyn that did not warrant the proposed subsidies.

86.   This proceeding seeks to enjoin NYCHPD from considering or approving any subsidies or financial assistance for the Project, including tax exempt bonds, unless and until there has been a Supplemental EIS that addresses and proposes realistic mitigation measures for the issues raised in this petition.

## VI.   THE CITY RESPONDENTS HAVE REFUSED TO PREPARE A SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT FOR THE PROJECT

87.   On March 4, 2013, the Petitioner Unions demanded that the City Respondents conduct a supplemental environmental review to analyze the cumulative impact of the other projects on the Flatbush Corridor and to take into account the failure of the 2004 FEIS or the 2007 MTM to analyze the impact of the low wages to be paid on the Project on the socioeconomic conditions of the communities affected by the Project. (A copy of the March 4,

32

2013 letter to Deputy Mayor Steel is attached as Exhibit L.) The Petitioner Unions argued that the outdated 2004 FEIS, based on hearings held most recently 9 years ago, in March and April of 2004, was not a realistic assessment of the burdens being imposed on the Downtown Brooklyn communities given the extraordinary development that has occurred in Downtown Brooklyn in the last 9 years. The Petitioner Unions argued to Steel that the tens of thousands of new residents and visitors strain an already overcrowded Downtown Brooklyn school system, park system, transit system and police and fire departments.

88.    Steel has ignored the March 4, 2013 letter requesting a Supplemental EIS. The Construction of Phase I of the Project is completed and Phase II is beginning. Any additional delay in preparing a Supplemental EIS will render it meaningless and entirely deprive the Petitioners and the communities they represent of the benefits intended under SEQRA and CEQR.

89.    The determination by the City Respondents to refuse to undertake a Supplemental EIS of the Project to analyze the impact of the post March, 2004 development in the Flatbush Corridor is arbitrary, capricious and contrary to law.

**AS AND FOR A FIRST CAUSE OF ACTION UNDER ARTICLE 78 AGAINST MICHAEL BLOOMBERG, AS MAYOR OF THE CITY OF NEW YORK; ROBERT K. STEEL, AS DEPUTY MAYOR FOR ECONOMIC DEVELOPMENT AND REBUILDING; NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT; NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION; AND NEW YORK CITY HOUSING DEVELOPMENT CORPORATION**

90.    Petitioners repeat and reallege paragraphs 1 through 89 as if fully set forth.

91.    The City Respondents acted illegally and arbitrarily and capriciously and violated SEQRA and CEQR when they declined to produce a Supplemental Environmental Impact Statement to analyze the socioeconomic impact of the Project upon the surrounding Brooklyn

33

communities based on the impact on the Downtown Brooklyn communities of the very low wages and no benefits being paid to construction workers who built Phase I and are building Phase II.

92.     The City Respondents acted illegally and arbitrarily and capriciously and violated SEQRA and CEQR when they failed and refused to take a hard look at the Project based upon post-March, 2004 development in Downtown Brooklyn.

93.     The actions by the City Respondents in connection with the Project warrant an injunction against the City Respondents and the Developer Respondents to preclude them from taking any further actions in connection with the Project, including financing the Project and constructing the Project, unless and until the obligations imposed by SEQRA and CEQR have been satisfied.

94.     An Order and Judgment pursuant to Article 78 should be entered against the Respondents adjudging that the City Respondents have acted illegally, arbitrarily and capriciously and in violation of their obligations under SEQRA and CEQR by failing and refusing to take a hard look at the Project and by failing and refusing to issue a Supplemental EIS and enjoining any further work on the Project until the obligations of SEQRA and CEQR are satisfied.

**AS AND FOR A SECOND CAUSE OF ACTION UNDER CPLR 3001 AGAINST MICHAEL BLOOMBERG, AS MAYOR OF THE CITY OF NEW YORK; ROBERT K. STEEL, AS DEPUTY MAYOR FOR ECONOMIC DEVELOPMENT AND REBUILDING; NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT; NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION; AND NEW YORK CITY HOUSING DEVELOPMENT CORPORATION**

95.     Petitioners repeat and reallege paragraphs 1 through 94 as if fully set forth.

. 34

96.    The City Respondents acted illegally and arbitrarily and capriciously when they declined to produce a Supplemental Environmental Impact Statement to analyze the impact on the communities in Brooklyn where construction workers reside of the extremely low wages being paid by the Developer Respondents.

97.    The City Respondents acted illegally and arbitrarily and capriciously and violated SEQRA and CEQR when they failed and refused to take a hard look at the Project to analyze the impact on the communities in Brooklyn where construction workers reside of the extremely low wages being paid by the Developer Respondents.

98.    A Declaratory Judgment should be entered against the Respondents declaring that the City Respondents have acted illegally, arbitrarily and capriciously and in violation of their obligations under SEQRA and CEQR by failing and refusing to take a hard look at the Project and by failing and refusing to issue a Supplemental EIS.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST ACADIA REALTY TRUST, ALBEE DEVELOPMENT LLC, WASHINGTON SQUARE PARTNERS INC. AND BFC PARTNERS DEVELOPMENT LLC**

99.    Petitioners repeat and re-allege paragraphs 1 through 98 as if fully set forth.

100.    Acadia Realty Trust, Albee Development LLC and Washington Square Partners Inc. sought and accepted enormous public subsidies and financing allowing them to construct Phase I of the Project and those contractors together with BFC Partners Development LLC are seeking additional public assistance to allow them to construct Phase II of the Project without regard for the impact that its wages and benefits will have upon the existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character.

101.    Acadia Realty Trust, Albee Development LLC, Washington Square Partners Inc. and BFC Partners Development LLC should be enjoined from any further efforts to construct the Project

35

unless and until the New York City Respondents complete the adequate environmental review including a Supplemental Environmental Impact Statement that they are obligated by law to perform prior to providing any support or subsidy for the Project.

## RELIEF REQUESTED

WHEREFORE, Petitioners respectfully request relief as follows:

1.  Annulling the determinations by the City Respondents refusing to issue a Supplemental Environmental Impact Statement addressing the cumulative impact of the development since 2004 on the Project's impact on the environment in Downtown Brooklyn;

2.  Annulling the determinations by the City Respondents refusing to issue a Supplemental Environmental Impact Statement addressing the impact on the communities throughout Brooklyn of the Developer Respondents' paying low wages and no benefits for construction work on the Project's impact;

3.  Declaring that the City Respondents and the Developer Respondents have violated SEQRA and CEQR in connection with the Project;

4.  Enjoining the City Respondents and the Developer Respondents from taking any further actions in connection with financing or constructing the Project unless and until the obligations of SEQRA and CEQR are satisfied, including holding a new public hearing on the Project.

5.  Awarding Petitioners attorneys' fees, costs and disbursements in this action and such other and further relief that the Court deems just and proper.

36

No prior application for the relief requested has been made.

Dated: May 1, 2013
      New York, NY

                                      **KENNEDY JENNIK & MURRAY, P.C.**
                                      *Counsel for Petitioners*

                                      By: Thomas M. Kennedy
                                          Susan M. Jennik
                                      113 University Place, 7th Floor
                                      New York, NY 10003
                                      (212) 358-1500

37

## VERIFICATION

State of New York          )
                           ) ss.:
County of New York         )

Terrence Moore, being duly sworn, hereby deposes and says as follows:

I hereby verify that I have read the attached Article 78 Petition and know the contents,

and the information contained therein is true and accurate, to the best of my information,

knowledge and belief.

_____
Terrence Moore

Sworn to before me this
1ˢᵗ day of May, 2013

_____
Notary Public

LISA V. THOMAS
No. 01TR6077607
Notary Public, State of New York
Qualified in Kings County
My Commission Expires Sept. 20, 2014